## AFFIDAVIT IN SUPPORT OF AN APPLICATION
## UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Patrick Dawley, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.       I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a search warrant authorizing the examination of property—three

electronic devices—which are currently in law enforcement possession, and the extraction from

that property of electronically stored information described in Attachment B.

2.       I am a Special Agent with the United States Department of Justice, Bureau of

Alcohol, Tobacco, Firearms, and Explosives (hereinafter, "ATF"), and have been since

Februaryof 2019. I am currently assigned to the Manchester, New Hampshire Field Office in

the Boston Field Division. While training to become a Special Agent, I attended the Federal

Law Enforcement Training Center (hereinafter, "FLETC") in Glynco, GA full-time for six-and-

a-halfmonths. During my time at FLETC, I received training in practices and methods of illegal

firearm possessors, firearm traffickers, and related federal criminal statutes. Prior to becoming

anATF Special Agent, I was a Police Officer for the Reading, Massachusetts Police Department

forapproximately seven years. Over the course of my law enforcement career, I have conducted

and/or participated in a number of investigations involving state and federal firearm and

controlled substance violations. I have interviewed multiple victims, sources of information,

witnesses, suspects, and defendants regarding various types of criminal activity. I have also

served search warrants for various crimes and have made criminal arrests for firearm and

controlled substance violations. I participated in state and federal investigations involving

possession of illegal weapons including firearms, improvised explosive devices and possession

of controlled substances. I also conducted numerous investigative stops and probable cause searches of people and vehicles. I participated in physical surveillance operations and participated in the execution of state and federal arrest warrants.

3.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

4.      The property to be searched is a white Apple iPhone (unknown model) smartphone in a black case (hereinafter, "Telephone 1"), and a gold Apple iPhone (unknown model) smartphone (hereinafter, "Telephone 2"), and an Apple iPad, in a black case (the "Tablet"), collectively referred to as the "Devices."

5.      The Devices are currently in the lawful possession of the ATF.  They came into the ATF's possession in the following way:  On December 10, 2021, Telephone 1 was observed in plain view on the front driver's seat of a silver 2005 Toyota Highlander, bearing Massachusetts registration 519EF2, which was seized pending a federal search warrant in the District of Massachusetts. In order to protect the integrity of the potential digital evidence and contents of Telephone 1, the phone was seized by ATF Agents, placed in airplane mode and transported to the ATF Manchester Field Office, where it was retained as evidence and secured in the Evidence Vault, in a manner to prevent outside and cloud-based interference and attempted destruction of the contents contained within Telephone 1.

6.      On December 11, 2021, I obtained a search warrant from the District of Massachusetts for the silver 2005 Toyota Highlander, bearing 519EF2, which had been seized

and secured on December 10, 2021, at Sheehan's Towing, located at 10 Carver Street, Lawrence, Massachusetts, 21-6747-MPK (the "21-6747-MPK warrant"). The 21-6747-MPK warrant authorized the search of the aforementioned Toyota Highlander, and authorized agents to seize, among other things, records and tangible objects pertaining to the travel or whereabouts of the vehicle, including location data information stored on any GPS or other location tracking device installed, and evidence related to occupancy or use of the vehicle. While executing the 21-6747-MPK warrant, the ATF seized Telephone 2 and the Tablet.

7.      The Devices are currently in storage at the evidence locker at ATF's Manchester, New Hampshire field office.  In my training and experience, I know that the Devices have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as it was when the Devices first came into the possession of the ATF.

8.      The applied-for warrant would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

## **PROBABLE CAUSE**

9.      I am currently investigating a theft from a FFL committed by multiple individuals on December 8, 2021, from Second Amendment Outdoors, a FFL (FFL # 6-02-015-07-3K-03269), located at 158 Rockingham Road, Suite #4, Derry, New Hampshire 03038, in violationof Title 18, United States Code, Sections 371 and 924(m).

10.      In the early morning of December 8, 2021, Second Amendment Outdoors was broken into. Second Amendment Outdoors is located in a strip plaza and is one business of a number of businesses in a one-story building.

3

11.     Law Enforcement processed the burglary scene and conducted an initial review of security video from Second Amendment Outdoors. Those videos showed that, at approximately 5:05 AM, a blue Chevrolet Cruz (the "Chevrolet Cruz") entered the plaza from Rockingham Road southbound (also named Route NH-28) and backed into the spot in front of Second Amendment Outdoors. Three masked, gloved subjects wearing hooded sweatshirts over their heads, who I believe to be males based on their body shapes, size and gait, exited the Chevrolet Cruz. Based on review of the security footage, the three suspected males appear as follows:



*Figure 1: Three Suspects Exiting Chevrolet Cruz*

a.  Suspect #1 exited the rear passenger side door of the Chevrolet Cruz and appeared to be an average build, possibly Hispanic male, wearing light gray outer hoodie (and possibly an Adidas hoodie underneath outer hoodie), light gray sweatpants and white tennis sneakers. Suspect #1 wore a mask and dark-colored gloves, appeared to have a phone in his right pants pocket and appeared to hold a light-colored bag as he approached the FFL front door. Suspect #1 removed a pair of what appeared to be pliers from his left pants pocket and later used the item to smash the glass

firearm display case inside of the FFL.



*Figure 2: Suspect #1*

b. Suspect #2 exited the front passenger side door of the Chevrolet Cruz and appeared to be a shorter, possibly white male, wearing a darker-colored hooded sweatshirt, gray sweatpants and gray sneakers with white soles. Suspect #2 wore a dark face mask, dark gloves, carried a large multi-colored duffle bag with red strap and also used yellow pliers. Suspect #2 approached the FFL carrying a fire extinguisher.



*Figure 3: Suspect #2*

c.  Suspect #3 exited the rear driver's side door of the Chevrolet Cruz and
appeared to be a taller, possibly black or Hispanic male, wearing a dark,
possibly black hooded sweatshirt with what appeared to be the
"Champion" logo on front left chest and left sleeve, dark-colored
sweatpants, black socks, and Nike sandals. Suspect #3 wore a blue
medical facemask, a white head cover, black gloves and carried a light-
colored duffle bag, similar to Suspect #1's.



*Figure 4: Suspect #3*

    d.   Suspect #4 was operating the Chevrolet Cruz, but never exited the

        vehicle. As the suspects approached the FFL, the trunk to the Chevrolet

        Cruz opened, which indicates to me that a driver remained inside of the

        Chevrolet Cruz.

    12.    Suspect #2 broke the glass entrance door to Second Amendment Outdoors with a

fire extinguisher. Suspect #1 and Suspect #2 utilized pliers to remove the smashed glass from the

door frame and Suspect #1 entered the store. Suspect #1 utilized what appeared to be a pair of

pliers to break the glass on a display case containing pistols. Suspect #1 took pistols from the

broken display case and two long guns from the wall display. Suspect #1 passed the long guns

and pistols to Suspect #2 through the opening in the front door. Suspect #1 then went back to the

broken display case and took more pistols. Suspect #1 then threw the pistols through the opening

in the front door. Suspect #2 and Suspect #3 collected the thrown firearms from the sidewalk.

Suspect #1 climbed through the opening in the front door and the three suspects got back into the

Chevrolet Cruz in their respective doors.  The vehicle exited the plaza via Route NH-28 southbound. The entirety of the burglary lasted approximately one minute.

13.     At the time the burglary occurred, Second Amendment Outdoors was closed and no store employees or their smartphones were present.

14.     Michael Bracci, owner of Second Amendment Outdoors, advised that the following twelve firearms were stolen during the burglary:

| Manufacturer | Model | Caliber | Type | Serial Number |
|---|---|---|---|---|
| Ruger | 10/22 | 22 LR | Rifle | 0010-58641 |
| Ruger | LC9S | 9mm | Pistol | 321-41855 |
| Ruger | 10/22 CHARGER | 22 LR | Pistol | 492-14433 |
| Bersa | Thunder 380 | 380 | Pistol | 969083 |
| Kimber | Micro 380 | 380 | Pistol | P0041659 |
| Smith & Wesson | M&P 380 Shield | 380 | Pistol | NCV8929 |
| Taurus | G3C | 9mm | Pistol | ACG061880 |
| Taurus | G3C | 9mm | Pistol | ABH843415 |
| Star, Bonifacio Echeverria | Ultra Star | 9mm | Pistol | 2137062 |
| Springfield / HS Produkt (IM METAL) | XD-9 | 9mm | Pistol | BA226333 |
| SAR Arms (Sarsilmaz) | SAR9 | 9mm | Pistol | T1102-20BV06755 |
| Bersa | Thunder 380 | 380 | Pistol | 135725 |

Bracci said that each firearm was loaded with a magazine.

15.     On December 9, 2021, the Salem, New Hampshire Police Department recovered a 2016 blue Chevrolet Cruz, bearing NH registration 4726569, which was located at the Town of Salem, NH Water Treatment Facility at 161 N. Policy Street, Salem, NH. The vehicle was queried through NCIC and determined to be reported stolen from 26 Sunset Drive, Atkinson, NH on December 6, 2021.

16.     On the same day, ATF obtained consent from the registered owner of the Chevrolet Cruz to process and search its contents. The consent search yielded a pistol magazine, a rifle flash suppressor, broken glass and two white retail firearms tags from the trunk of the vehicle. The tags belonged to the stolen Kimber Micro 380 Raptor Custom Shop pistol and Taurus PT111 G3C pistol. A piece of black latex glove was located in the rear passenger seat floorboard. A pair of wire cutters was also located on the backseat.

17.     I reviewed video surveillance from the parking lot of 161 N. Policy Street, obtained from the Town of Salem, and observed that, at approximately 4:48 AM ET on December 8, 2021 (before the burglary), the Chevrolet Cruz turned into the parking lot from N. Policy Street southbound.  The Chevrolet Cruz was followed by a suspected light-colored Toyota Highlander.

18.     From the video, I observed the operator of the Chevrolet Cruz get out of the car from the driver's seat and leaves the door open.  This person then walks around the rear of the Chevrolet Cruz towards the passenger side. Because of the camera angle, I was not able to see this individual get back into the Chevrolet Cruz, but because no individuals were in the parking lot when the Chevrolet Cruz drove away, I believe this individual got into the rear passenger side door.  I believe that Suspect #1 was the initial operator of the Chevrolet Cruz as it first arrived at the Town of Salem Water Treatment Plant. I observed that Suspect #1 had what appeared to be a cellphone in his pocket during the FFL burglary.

19.     The door to the Chevrolet Cruz appeared to be closed by someone inside of the vehicle as no one else got into the driver's seat from outside of the vehicle.  This is consistent with someone already inside of the vehicle to change seating positions inside of the vehicle, such as the front passenger moving over to the driver's seat. I know that Suspect #4 was

positioned in the driver's seat of the Chevrolet Cruz during the FFL burglary.

20.     I observed two individuals exit the suspected Toyota Highlander and get into the Chevrolet Cruz.  The individual who got out of the front passenger seat of the suspected Toyota Highlander appeared to be carrying a large object, similar to the way in which Suspect # 2 carried the fire extinguisher as captured carrying on the Second Amendment Outdoors security camera.  This individual got into the front passenger side of the Chevrolet Cruz, the same seat that Suspect #2 was in when the Chevrolet Cruz parked outside of Second Amendment Outdoors.

21.     The other individual who got out of the driver's side of the suspected Toyota Highlander got into the rear passenger side of the Chevrolet Cruz.  I know that Suspect #3 was positioned in the rear driver's side seat of the Chevrolet Cruz during the FFL burglary.

22.     I know that Suspect #1 was positioned in the rear passenger side of the Chevrolet Cruz during the FFL burglary, therefore I believe that Suspect #3 had more likely than not entered the rear passenger side of the Chevrolet Cruz and moved over to the rear driver's side. I believe that Suspect #1 was the initial operator of the Chevrolet Cruz and was the last person to enter the rear passenger side of the vehicle, which would more likely than not prompt Suspect #3 to move from the passenger side to the driver's side rear seat.

23.     At approximately 4:53 AM ET the Chevrolet Cruz exited the parking lot and headed northbound on N. Policy Street.

24.     At approximately 5:16 AM ET, the Chevrolet Cruz returned to the parking lot from N. Policy Street northbound. The Chevrolet Cruz parked in the spot in which the Salem Police Department recovered the stolen Chevrolet Cruz later that morning. Upon parking the vehicle, four occupants of the vehicle exited the Chevrolet Cruz and removed items from the

trunk of the vehicle. A suspect who appeared similar to Suspect #1 was observed holding a bag similar to the light-colored bag observed being held by Suspect #1 on the Second Amendment Outdoors security video. I observed a long protruding object from the end of the bag, similar to that of a rifle barrel. The suspects entered the suspected Toyota Highlander SUV.

25.     At 5:17 AM ET, the suspected Toyota Highland SUV left the parking lot, driving southbound on N. Policy Street.

26.     According to Google Maps, the driving distance between 161 N. Policy Street, Salem, NH and 159 Rockingham Road, Derry, NH is approximately 5.2 miles and would take approximately 9 minutes to travel from one point to the next. I believe that the Chevrolet Cruz captured on security camera at 161 N. Policy Street was the same Chevrolet Cruz used during the commission of the FFL burglary at Second Amendment Outdoors. I believe that the Chevrolet Cruz traveled directly from the Water Treatment Facility to Second Amendment Outdoors and returned directly back to the Water Treatment Facility after the commission of the burglary.

27.     I learned from Lawrence Police Department ("LPD") Detective Alex Ovalles that the Chevrolet Cruz was captured on Flock License Plate Readers in the City of Lawrence on December 6, 2021, at 2:15 AM ET on Marston Street northbound in Lawrence. LPD Detective Ovalles stated the Chevrolet Cruz was driving in tandem with a 2005 silver Toyota Highlander, bearing Massachusetts registration 519EF2 (the "Highlander"). I queried the vehicle and learned it was registered to Gary A. Ortiz of 19 13th Avenue, Haverhill, Massachusetts (the "ORTIZ residence").

28.     I learned from LPD Detective Ovalles that Gary E. ORTIZ ("ORTIZ") has the listed address of the ORTIZ residence and has had numerous past interactions with local law enforcement. According to Detective Ovalles, ORTIZ is affiliated with the Gangster Disciple

national street gang and is known to carry a firearm on his person. Detective Ovalles stated

ORTIZ was a suspect in numerous shootings in Lawrence and Haverhill, Massachusetts.

29.     I observed Haverhill Police Department ("HPD") report #21052669, regarding an

October 18, 2021 malicious destruction of property incident, and learned ORTIZ was captured

on security camera breaking a window of a vehicle and then fleeing the scene while operating the

Highlander.

30.     I learned through conversation with ATF Special Agent ("SA") John Cook, that

on December 10, 2021, SA Cook observed the Highlander while conducting surveillance at the

Princeton Village Condominiums, located on Henry Avenue in Lawrence, Massachusetts. SA

Cook followed the Highlander and contacted the Lawrence Police Department to request backup

in order to conduct a motor vehicle stop to seize the Highlander pending a federal search

warrant. I learned from SA Cook that the operator the Highlander, later identified as ORTIZ,

began to operate the Highlander in a manner consistent with counter surveillance such as random

U-turns, speeding up and slowing down and aimless turning. Due to the evasive operation, SA

Cook initiated his emergency lights and sirens to conduct a motor vehicle stop in the vicinity of

Howard Street and Pleasant Street in Lawrence, Massachusetts. LPD officers were immediately

on scene to assist SA Cook. The operator, identified as ORTIZ, and the passenger, identified as

Pedro RODRIGUEZ, were ordered from the vehicle, detained and placed into handcuffs for

officer safety. Investigators conducted a pat-frisk of both ORTIZ and RODRIGUEZ. ORTIZ was

found to have a knife on his pants pocket. No firearms were located.

31.     Both ORTIZ and RODRIGUEZ were removed from handcuffs and advised they

were not under arrest. SA Cook attempted a roadside interview with ORTIZ who stated he lived

at the ORTIZ residence and that the Highlander belonged to him. ORTIZ and RODRIGUEZ both declined at answer further questions.

32.     I learned from SA Cook that ORTIZ was wearing a black hooded sweatshirt, gray sweatpants, black socks and black shoes. SA Cook provided a photograph of ORTIZ's outfit from the scene of the motor vehicle seizure:



33.     I learned from ATF SA Kristi McPartlin, who was present on scene to back up SA Cook, that the Highlander had a broken front passenger window and was missing the front passenger side mirror. SA McPartlin stated that in plain view, visible through the missing front passenger window, she observed black sandals with a white Nike logo in the center console compartment along the floorboard, under the Highlander's gear shifter.



34.     The Nike sandals observed in the Highlander are similar to those worn by Suspect #3 during the Second Amendment Outdoors burglary. The gray sweatpants and black socks worn by ORTIZ were also similar to those worn by Suspect #3.



35.     The Highlander was seized and towed by Sheehan's Towing to their secured facility at 10 Carver Street, Lawrence, Massachusetts. SA McPartlin followed the vehicle and

ensured the Highlander was not accessed by anyone and was in the same state as when it was seized.

36.    On December 10, 2021, ATF Agents spoke with Yumira Penalo, ORTIZ's mother, at the ORTIZ residence and obtained consent to search the common areas of the ORTIZ residence. ATF Agents did not locate any firearms or pertinent evidence in the consent search. By her own volition, Ms. Penalo searched ORTIZ's bedroom while being observed by ATF Agents and no firearms or pertinent evidence was located.

37.    Ms. Penalo stated that ORTIZ resided at the ORTIZ residence but often stayed with friends. Ms. Penalo stated that ORTIZ was gone the evening of December 7, 2021, into December 8, 2021, celebrating his birthday. SA Forte asked Ms. Penalo about the damage to the front passenger side of the Highlander, to which she stated that she believed that damage must have "just happened."  She said that she had seen the Highlander that morning at approximately 7:00 AM ET on her way to work and did not observe damage to it.

38.    I reviewed the Town of Salem Water Treatment Plant Security Video, dated December 8, 2021, at 4:48 AM ET and 5:17 AM ET and observed the suspected Toyota Highlander to have a passenger side mirror.

39.    On December 11, 2021, I applied for and obtained the 21-6747-MPK warrant to search the Highlander. The 21-6747-MPK warrant authorized the search of Highlander for evidence related to the FFL burglary at Second Amendment Outdoors, and authorized agents to seize, among other things, records and tangible objects pertaining to the travel or whereabouts of the vehicle, including location data information stored on any GPS or other location tracking device installed, and evidence related to occupancy or use of the vehicle.  Agents executed the warrant later that day and observed and/or seized: (1) a school ID and Massachusetts Driver's

License [photographs, not seized]; (2) a ripped white tag, which read "9mm" "3 mags" "$350" and white string, consistent with the white tags and string attached to all firearms at Second Amendment Outdoors;[1] (3) a black "Champion" hooded sweatshirt, gray sweatpants and black Nike sandals, similar to those worn by Suspect #3 during the FFL burglary; (4) a black balaclava, similar to the face coverings observed on Suspect #1 and Suspect #2 during the FFL burglary; (5) two pairs of black rubber and/or latex gloves, double lined with a pair of white gloves on the inside; (6) a bag containing the Tablet, which had "11132 Gary Ortiz" written on a label attached to it and "iPad (2) Gary Ortiz 11132@student.whittiertech.org iPad (2) – DMQWWLUEJF8J – Student – iPad" on the home screen; (7) assorted hand tools, to include a pair of yellow pliers, similar to that possessed by Suspect #2 during the FFL burglary; (8) two safety chamber indicators for Taurus pistols; (9) a black Polymer80, model PF940V2, 9x19mm pistol (not stolen from the FFL burglary) with no visible serial number, loaded with a 10-round magazine containing four rounds of 9x19mm ammunition; (10) shards of glass in the trunk cargo area; (11) Telephone 2 concealed in the trunk cargo area; and (12) a Verizon Hum OBD tracking system device.

### SEIZURE OF SMARTPHONE(S) AND DATA

40.     I believe that it is more likely than not that the suspected Toyota Highlander observed at the Town of Salem Water Treatment Plant on the early morning of December 8, 2021, known to be operated by Suspect #3, was the Highlander. Therefore, I believe ORTIZ to

---

[1] The tag is ripped but the letters "U" and "L" were visible on it.  Based on my training and experience, and a conversation with Mr. Bracci on December 13, 2021, I believe the tag was from the stolen Star, Ultra Star, 9x19mm pistol, serial number 2137062.

be Suspect #3 due to operating the vehicle when it was seized by ATF, operating in the

vicinity on numerous occasions where the stolen Chevrolet Cruz and the Highlander were

observed together on Flock license plate readers, past documented events where ORTIZ was

the known operator of the Highlander, and by the admission of his parents that he frequently

operates the Highlander.

41.     Through my training, knowledge and experience I know that a group of

individuals who plan to meet at a preplanned location utilizing multiple vehicles often

communicate via cellphones to communicate and plan the meetup location. I believe it is more

likely than not that Suspect #1 and Suspect #3 and/or the other suspects and undetermined

individuals involved in the planning of the FFL burglary communicated via cellphone.

42.     I know that individuals utilize smartphone cellphones when preplanning

burglaries to communicate with co-conspirators, research potential targets, such as FFLs,

establish rendezvous locations, and to obtain directions to the target locations.  I know that

individuals in modern times carry smartphone cellphones on their persons, inside of vehicles

they utilize or in their residences, often during all times of the day.

43.     I believe Telephone 1, located in the Highlander, is primarily used by ORTIZ,

given his admission that his cellphone was inside of the vehicle and found where he had been

seated in the vehicle.

44.     I believe the Tablet, located in the rear seat of ORTIZ's Highlander, in a bag of

tools, was issued to ORTIZ by Whittier Regional Vocational Technical High School

(hereinafter, "Whittier Tech"), where he attended high school, based upon the label which

read  "11132 Gary Ortiz" and "iPad (2) Gary Ortiz 11132@student.whittiertech.org iPad (2) –

DMQWWLUEJF8J – Student – iPad" on the home screen. I know that electronic devices

issued by education programs and/or employers frequently have device location information turned on in order to track the device location and/or retrieve their property, if necessary.

45.     I believe Telephone 2, located in the Highlander, was concealed in the trunk cargo area due to being lost by a previous occupant of the vehicle, such as falling out a pocket, and or was attempted to be concealed from being located and out of plain view. I know that individuals involved in firearms trafficking frequently use multiple cellphones to communicate with co-conspirators and/or potential buyers and sellers of firearms.

46.     Based on my training, experience, and information provided by other law enforcement officers, I know that many cell phones (which are included in Attachment B's definition of "hardware") can now function essentially as small computers.  Phones have capabilities that include serving as a wireless telephone to make audio calls, digital camera, portable media player, GPS navigation device, sending and receiving text messages and emails, and storing a range and amount ofelectronic data. Examining data stored on devices of this type can uncover, amongother things, evidence of communications and evidence of communications and evidence that reveals or suggests who possessed or used the device.

47.     I know through my training and experience that individuals involved in FFL burglaries and thefts of firearms will often drive, utilizing vehicles, to a location following the commission of a burglary or theft in an attempt to conceal or dispose of firearms. I know that individuals often communicate with co-conspirators via electronic devices to plan, research and find directions to such a location.

48.     From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type describedin Attachment B in smartphones.

## **TECHNICAL TERMS**

49.     Based on my training and experience, I use the following technical terms to

convey the following meanings:

e.   Wireless telephone:  A wireless telephone (or mobile telephone, or cellular

telephone) is a handheld wireless device used for voice and data communication

through radio signals.  These telephones send signals through networks of

transmitter/receivers, enabling communication with other wireless telephones or

traditional "land line" telephones.  A wireless telephone usually contains a "call

log," which records the telephone number, date, and time of calls made to and

from the phone.  In addition to enabling voice communications, wireless

telephones offer a broad range of capabilities.  These capabilities include: storing

names and phone numbers in electronic "address books;" sending, receiving, and

storing text messages and e-mail; taking, sending, receiving, and storing still

photographs and moving video; storing and playing back audio files; storing

dates, appointments, and other information on personal calendars; and accessing

and downloading information from the Internet.  Wireless telephones may also

include global positioning system ("GPS") technology for determining the

location of the device.

f.   Digital camera:  A digital camera is a camera that records pictures as digital

picture files, rather than by using photographic film.  Digital cameras use a

variety of fixed and removable storage media to store their recorded images.

Images can usually be retrieved by connecting the camera to a computer or by

connecting the removable storage medium to a separate reader.  Removable

storage media include various types of flash memory cards or miniature hard

drives.  Most digital cameras also include a screen for viewing the stored images.

This storage media can contain any digital data, including data unrelated to

photographs or videos.

g.  Portable media player:  A portable media player (or "MP3 Player" or iPod) is a

handheld digital storage device designed primarily to store and play audio, video,

or photographic files.  However, a portable media player can also store other

digital data.  Some portable media players can use removable storage media.

Removable storage media include various types of flash memory cards or

miniature hard drives.  This removable storage media can also store any digital

data.  Depending on the model, a portable media player may have the ability to

store very large amounts of electronic data and may offer additional features such

as a calendar, contact list, clock, or games.

h.  GPS:  A GPS navigation device uses the Global Positioning System to display its

current location.  It often contains records the locations where it has been.  Some

GPS navigation devices can give a user driving or walking directions to another

location.  These devices can contain records of the addresses or locations involved

in such navigation.  The Global Positioning System (generally abbreviated

"GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite

contains an extremely accurate clock.  Each satellite repeatedly transmits by radio

a mathematical representation of the current time, combined with a special

20

sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

i.  PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

j.  Tablet:  A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen.  Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise.  Tablets typically contain programs called apps, which, like programs on a personal

computer, perform different functions and save data associated with those functions.  Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

k.  Pager:  A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network.  Some pagers enable the user to send, as well as receive, text messages.

l.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

m.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

50.     Based on my training, experience, and research, I know that the Devices have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the devices.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

51.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

52.     There is probable cause to believe that things that were once stored on the Devices, may still be stored there, for at least the following reasons:

a.   Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.   Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.   Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.   Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

53.   *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how each Device was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

24

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.  Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f.   I know that when an individual uses an electronic device to obtain drugs or

firearms, the individual's electronic device will generally serve both as an

instrumentality for committing the crime, and also as a storage medium for

evidence of the crime.  The electronic device is an instrumentality of the crime

because it is used as a means of committing the criminal offense.  The electronic

device is also likely to be a storage medium for evidence of crime.  From my

training and experience, I believe that an electronic device used to commit a crime

of this type may contain: data that is evidence of how the electronic device was

used; data that was sent or received; and other records that indicate the nature of

the offense.

54.   *Nature of examination.*  Based on the foregoing, and consistent with Rule

41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent

with the warrant.  The examination may require authorities to employ techniques, including but

not limited to computer-assisted scans of the entire medium, that might expose many parts of the

device to human inspection in order to determine whether it is evidence described by the warrant.

55.   *Manner of execution.*  Because this warrant seeks only permission to examine a

device already in law enforcement's possession, the execution of this warrant does not involve

the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the

Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

56.     I submit that this affidavit supports probable cause for a search warrant

authorizing the examination of the Devices described in Attachment A to seek the items

described in Attachment B.

Respectfully submitted,

/s/ Patrick Dawley
Patrick Dawley
Special Agent
Bureau of Alcohol, Tobacco, Firearms and
Explosives

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R.

Crim. P. 4.1 and affirmed under oath the content of this affidavit and application.

Date:  **Dec 13, 2021**
Time: **5:14 PM, Dec 13, 2021**

_____
Hon. Andrea K. Johnstone
United States Magistrate Judge

27

## **ATTACHMENT A**

The property to be searched is a white Apple iPhone (unknown model) smartphone in a black case (hereinafter, "Telephone 1"), and a gold Apple iPhone (unknown model) smartphone (hereinafter, "Telephone 2"), and an Apple iPad, in a black case (the "Tablet"), collectively the "Devices." The Devices are currently located at the ATF Evidence Vault in Manchester, New Hampshire.

This warrant authorizes the forensic examination of the Devices for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.      All records on the Devices described in Attachment A that relate to in violation of

Title 18, United States Code, Sections 371 and 924(m), since November 1, 2021, including:

     a.   Any information related to the acquisition, possession, and disposition of

       firearms, including the following firearms:

| Manufacturer | Model | Caliber | Type | Serial Number |
|---|---|---|---|---|
| Ruger | 10/22 | 22 LR | Rifle | 0010-58641 |
| Ruger | LC9S | 9mm | Pistol | 321-41855 |
| Ruger | 10/22 CHARGER | 22 LR | Pistol | 492-14433 |
| Bersa | Thunder 380 | 380 | Pistol | 969083 |
| Kimber | Micro 380 | 380 | Pistol | P0041659 |
| Smith & Wesson | M&P 380 Shield | 380 | Pistol | NCV8929 |
| Taurus | G3C | 9mm | Pistol | ACG061880 |
| Taurus | G3C | 9mm | Pistol | ABH843415 |
| Star, Bonifacio Echeverria | Ultra Star | 9mm | Pistol | 2137062 |
| Springfield / HS Produkt (IM METAL) | XD-9 | 9mm | Pistol | BA226333 |
| SAR Arms (Sarsilmaz) | SAR9 | 9mm | Pistol | T1102-20BV06755 |
| Bersa | Thunder 380 | 380 | Pistol | 135725 |

     b.   Any information related to the 2016 blue Chevrolet Cruz, bearing NH registration

4726569;

    c.   Any information related to preplanning, including, but not limited to, research of Second Amendment Outdoors and other firearms stores, and the NH Water Treatment Facility at 161 N. Policy Street, Salem, NH;

    d.   Any information related to co-conspirators or individuals who took possession of stolen firearms (including names, addresses, phone numbers, and any other identifying information);

    e.   Any information regarding to schedule or travel from November 1, 2021 to the present;

    f.   Any information regarding the tools, clothing, and other items used during the December 8, 2021 Second Amendment Outdoors burglary;

2.    Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

## DEFINITIONS

For the purpose of this warrant:

    A.   "Data" means all information stored on storage media of any form in any

storage format and for any purpose.

B.    "A record" is any communication, representation, information or data.  A "record" may be comprised of letters, numbers, pictures, sounds or symbols.

**RETURN OF SEIZED MOBILE PHONES**

If the owner of the seized mobile phones requests that it be returned, the government will attempt to do so, under the terms set forth below.  If, after inspecting the seized equipment, the government determines that some or all of this equipment does not contain contraband or the passwords, account information, or personally-identifying information of victims, and the original is no longer necessary to retrieve and preserve as evidence, fruits or instrumentalities of a crime, the equipment will be returned within a reasonable time, if the party seeking return will stipulate to a forensic copy's authenticity (but not necessarily relevancy or admissibility) for evidentiary purposes.

If the equipment cannot be returned, agents will make available to the mobile phone's owner, within a reasonable time period after the execution of the warrant, copies of files that do not contain or constitute contraband; passwords, account information, or personally-identifying information of victims; or the fruits or instrumentalities of crime.

For purposes of authentication at trial, the Government is authorized to retain a digital copy of all equipment seized pursuant to this warrant for as long as is necessary for authentication purposes.